**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **DEVIN MCNULTY** <br><br> **Defendant.** | **Case No. 23-cr-235 (TSC)** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Devin McNulty to 24 months' incarceration, which is the low point of the Guideline range as calculated by the parties, and 36 months' supervised release, as well as order $2,000 in restitution and a mandatory assessment of $100.

**I.   INTRODUCTION**

The defendant, Devin McNulty, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The

1

McNulty, the owner of a moving company in Knoxville, Tennessee, arrived at the West Front of the Capitol Grounds as a small number of police officers tried to prevent rioters from moving towards the Capitol Building. McNulty stood nearby as rioters violently assaulted some of the officers, with one rioter spraying officers with chemical irritant and another tackling an officer to the ground. Despite witnessing this chaos, McNulty continued onward, eventually climbing a retaining wall to reach the Upper West Terrace of the Capitol. From there, McNulty joined a violent mob as it tried to breach into the Capitol Building through a set of double doors. At one point, McNulty himself moved towards the doors before being rebuffed by police officers. Afterwards, he stood by as other rioters further attempted to breach the doors with rocks and a bicycle rack. When a large group of police officers began to clear this area of rioters, McNulty resisted their efforts to do so. As Corporal R.R. moved towards the rioters with his shield in hand, McNulty pushed against the officer with increasing force. At times, he even tried to wrest control of the shield from Corporal R.R. Critically, McNulty's assault of Corporal R.R. helped normalize violence against the line of officers, which invited others to join his efforts.

The government recommends that the Court sentence McNulty to 24 months' incarceration. A 24-month sentence reflects the gravity of McNulty's conduct, but also acknowledges his early admission of guilt.

---

Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.  FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 27 at 1-3, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  McNulty's Role in the January 6, 2021 Attack on the Capitol

McNulty travelled to Washington, D.C. from Tennessee to attend to Stop the Steal rally outside of the White House on January 6, 2021. After the rally, McNulty marched to United States Capitol where he joined a large group of rioters gathered at the northwest corner of the grounds. By approximately 2:09 p.m., a small group of police officers attempted to keep the rioters behind a bicycle rack barricade and away from the Capitol Building. Figure 1. The rioters, however, completely outnumbered the officers and pushed the barricade to the ground. Figure 2.



Figure 1: Police officers defending bicycle rack barricade


Figure 2: Rioters kicking down and throwing bicycle racks as officers retreat

At 2:10 p.m., police officers in the same area attempted to arrest one of the rioters. Gov't Ex. 1 at 12:17. As the officers detained the rioter on the ground, another rioter in the crowd deployed chemical irritant towards the officers. *Id.* at 12:21. One of the officers tried to apprehend the rioter, but she was tackled to the ground by another individual in the crowd. *Id.* at 12:21-12:26. McNulty quickly approached the officer and spread his arms wide against the rioters besides him in an apparent attempt to allow the officer to regain her footing. *Id.* at 12:31-12:34.

However, despite witnessing these acts of violence towards police officers, McNulty did not leave the grounds. Rather, after the crowd forced the officers to retreat to the north side of the Capitol, McNulty approached the nearby retaining wall and climbed it to reach the Upper West Terrace. Figure 3; Gov't Ex. 2 at 16:56-17:03. By 2:52 p.m., McNulty walked amongst a crowd of rioters on the Terrace and proceeded towards the North Door of the Capitol. Figure 4.

4


Figure 3: McNulty (circled in red) climbing the Capitol's retaining wall


Figure 4: McNulty (circled in red) moving towards the North Door of the Capitol

At the North Door, rioters attempted to violently breach two sets of double doors, which lead into the Capitol. For some time, a group of officers stood guard outside the outermost set of doors, before retreating into the Capitol at approximately 3:52 p.m. At that point, rioters swarmed towards the second set of doors and repeatedly tried to break them down. Gov't Ex. 3 at 11:55-12:15. In an attempt to keep the rioters away from the doors, the officers inside the Capitol deployed fire extinguishers into the vestibule between the two sets of doors. Gov't Ex. 4 at 3:05-

5

3:20. Nonetheless, with the aerosol still in the air, McNulty proceeded towards the doors and looked through a pane of glass where he certainly would have seen a group of police officers in riot gear. Gov't Ex. 4 at 3:25-3:50. After a moment, McNulty was overcome by the spray, forcing him to retreat into the crowd. Figures 5. Around this time, and after officers deployed another burst of fire extinguisher spray, McNulty turned towards the crowd outside of the North Door to defiantly pump his fist in the air. Figure 6; Gov't Ex. 5 at 20:55-21:11.



Figure 5: McNulty (circled in red) retreating from the North Door



Figure 6: McNulty pumping his fist in the air before a crowd of rioters

Despite the need to fight through the polluted air, McNulty remained by the North Door as other rioters attempted to break down the inner doors. One pair of rioters threw rocks at the doors several times. Gov't Ex. 3 at 15:00-15:27. Shortly afterwards, another pair of rioters used a bicycle rack as a battering ram against the doors while McNulty looked on. Figure 5; Gov't Ex. 3 at 15:41-15:51.



Figure 7: McNulty (circled in red) looking on as rioters slam a bicycle rack against the doors

After these attempted breaches, several police officers arrived on scene to try to calm the situation down. Gov't Ex. 3 at 17:05-17:20. Despite the officers' attempts to assuage the rioters, McNulty and the others loudly confronted the officers. Figure 8. At times, the crowd chanted "let us in" while an emergency alarm blared in the background. *Id.* at 17:30-17:50.



Figure 8: McNulty (circled in red) verbally confronting officers at the North Door

A few minutes later, a different and significantly larger group of police officers moved towards the North Door from the Upper West Terrace. The officers moved in unison as they

worked to expel McNulty and the other rioters from the area. Gov't Ex. 3 at 22:50-23:10. As the officers reached the North Door, McNulty resisted the officers' efforts to remove him. One officer, Corporal R.R. of the Prince George's County Police Department, approached McNulty with a riot shield in hand. As the officer moved towards the crowd of rioters, McNulty placed both hands on the shield and pushed against it several times. Figure 9-10; Gov't Ex. 4 at 39:38-39:43. At one point, McNulty also grabbed onto the top of the shield with one of his hands. *Id.*; Figure 11. As McNulty continued to assault Corporal R.R., several other nearby rioters joined the assault against Corporal R.R. and other officers on the line. Gov't Ex. 3 at 23:25-24:07. When interviewed about this incident after the riot, Corporal R.R. distinctly remembered the interaction with McNulty as aggressive and persistent. The officer also recalled having to use increasing effort to combat McNulty's actions and to stop McNulty from taking the shield from him.



Figure 9: McNulty planting his legs while pushing against Corporal R.R.'s shield



Figure 10: McNulty (circled in red) pushing Corporal R.R.'s shield up and away from the officer's body



Figure 11: McNulty (circled in red) grabbing the top of Corporal R.R.'s shield

### III.   THE CHARGES AND PLEA AGREEMENT

On July 21, 2023, a federal grand jury returned an indictment charging McNulty with seven counts, including one count of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1). On February 1, 2024, McNulty pleaded guilty to that offense pursuant to a plea agreement.

## IV. STATUTORY PENALTIES

McNulty now faces sentencing on one count of assaulting, resisting, or impeding certain officers, in violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to 8 years' imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

## V. THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). As stated in the plea agreement and the PSR, the Guidelines calculation for the offense is as follows:

Count One: 18 U.S.C. § 111(a)(1)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | | 14 |
| U.S.S.G. § 3A1.2(a)-(b) | Official Victim | | +6 |
| | | **Total** | **20** |

Acceptance of responsibility (U.S.S.G. §3E1.1)                                                   -3

**Total Adjusted Offense Level:**                                                                **17**

*See* Plea Agreement at ¶¶ 4(A).

Section 4C1.1 does not apply in this case because McNulty used violence in connection with his offense. U.S.S.G. § 4C1.1(a)(3). Specifically, when confronted by Corporal R.R. as the officer attempted to clear McNulty and the other rioters from the Upper West Terrace, McNulty responded by pushing against the officer's shield multiple times. Such acts amount to the use of

11

violence and thus McNulty is not eligible for the two-point reduction under § 4C1.1. PSR ¶ 41.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 45. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 17, McNulty's Guidelines imprisonment range is 24 to 30 months' imprisonment. This calculation matches the agreed-upon Guidelines range calculation in McNulty's plea agreement.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, McNulty's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. For his part, McNulty assaulted Corporal R.R. by shoving the officer multiple times in an attempt to stop officers from securing the area outside the Capitol's North Door. In doing so, McNulty prompted other rioters to join in the violence, which resulted in even more assaults against other officers. Earlier in the day, however, McNulty also tried to help an officer who was tackled by a rioter. While this act does not negate his later assaultive behavior or participation in the attempted breach of the North Door, McNulty's actions as a whole counsel towards a sentence at the lower end of the applicable guideline range. Thus, a sentence of 24 months' incarceration thus fully accounts for the actions taken by McNulty on January 6.

### B. The History and Characteristics of the Defendant

Although the defendant does not have a criminal history, a review of the Presentence Report does not otherwise provide any additional mitigation. Indeed, before the riot, the defendant appeared to be a law-abiding citizen. This counsels in his favor. On the same token, however, the defendant's conduct is dramatic and dangerous.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. McNulty's criminal conduct on January 6 was the epitome of disrespect for the law, particularly as his offense involved a direct assault on a law enforcement officer.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Specifically, McNulty committed this

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

13

assault with no clear reason to do so. This assault did not occur in the heat of the moment. Rather, McNulty spent hours that day watching countless numbers of rioters commit various forms of assault against police officers. Despite having these hours to adjust his behavior away from violence, McNulty leaned into it as he assaulted Corporal R.R. This background to McNulty's unprompted assault demonstrates a clear need to specifically deter future violent acts by him.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully

14

review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the

15

offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Kevin Galetto*, 21-cr-517 (CKK), Galetto was one of the first rioters on the Lower West Terrace where the presidential inauguration would later be held. As Galetto arrived at this location, officers were retreating into the Capitol through a narrow hallway known as the Tunnel. Galetto followed the officers into the Tunnel where he first used his body weight to push other rioters into a line of officers. Then, when Galetto made his way to the front of the rioters, he grabbed onto an officer's riot shield and shoved the officer for several minutes. Eventually, the officer and Galetto collapsed to the ground from the force of the shoving. After Galetto regained his footing, he left the Tunnel and waved more rioters in to continue to push against the police line. Sometime later, Galetto returned to the Tunnel to participate in a "heave-ho" against officers. Following a guilty plea to one count of assaulting a federal officer, the Court sentenced Galetto to 27 months' incarceration and 24 months' supervised release.

Like Galetto, McNulty assaulted a police officer by grabbing onto an officer's shield and shoving him. This assault, as with the assault by Galetto, was part of a concerted set of assaults against officers by several rioters. McNulty also joined in a group effort to breach the Capitol. Although McNulty did not himself try to break down the North Door entrance, he stood ready to breach the building if and when others succeeded in doing so and he encouraged rioters to remain steadfast in the face of police countermeasures. The differences in the conduct by McNulty and Galetto thus suggest a slightly lower sentence than the one imposed against Galetto.

In *United States v. Jason Owens*, 21-cr-286 (BAH), Owens confronted police officers on the West Front of the Capitol. At that location, a large number of police officers formed a line behind bicycle racks to stop the rioters' forward progress. As other rioters began assaulting the

17

officers, Owens joined in by shoving one officer's helmet with such force that the officer's head snapped backwards. Later, Owens moved towards the East Rotunda Door on the opposite side of the building, where he and other rioters tried to breach into the Capitol. During his attempt to get inside the building, Owens joined a group of rioters streaming through the already-breached East Rotunda Door. Officers, however, rebuffed the rioters and pushed the group outside of the Capitol. Once the rioters were outside, one officer guarded the door by standing between it and the rioters. Owens then grabbed onto the officer's baton. The two then pushed each other back and forth for a short period of time. Following a guilty plea to a single count of assaulting a federal officer, the Court sentenced Owens to 24 months' incarceration and 36 months' supervised release, and imposed a $2,000 fine.

Unlike McNulty, Owens did not engage in any sort of rallying efforts to encourage other rioter' efforts. Owens also had some mitigating health concerns, namely diabetes, which factored into his sentence. Thus, although Owens acted violently against several officers on January 6, a sentence of comparable length for McNulty is appropriate.

## VII.   RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victim in this case, Corporal R.R., did not suffer bodily injury as a result of McNulty's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that McNulty must pay $2,000 in restitution, which reflects in part the role McNulty played in the riot on January 6.[6] Plea Agreement at ¶ 11. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) McNulty restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 115.

---

18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[6] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 24 months' incarceration and 36 months' supervised release, as well as order $2,000 in restitution and a mandatory assessment of $100.

                              Respectfully submitted,

                              MATTHEW M. GRAVES
                              UNITED STATES ATTORNEY


BY:   */s/ ANDREW HAAG*
        Andrew Haag
        Assistant United States Attorney
        MA Bar No. 705425
        601 D Street NW, Washington, DC 20530
        Tel. No.: (202) 252-7755
        Email: andrew.haag@usdoj.gov